**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:06cv182**

| | |
|---|---|
| **SUSAN SWEENEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **MARC GLOBAL, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant's Motion for

Summary Judgment [Doc. 32], filed on November 3, 2006 and Defendant's

Motion to Strike Portions of Plaintiff's Affidavit and Incorporated

Memorandum of Law [Doc. 42], filed on December 14, 2006.

**I.    Introduction**

The Plaintiff Susan Sweeney filed this action in the United States

District Court for the Middle District of North Carolina on January 12, 2006

against the Defendant MARC Global, Inc. ("MARC Global"), asserting

claims of pregnancy discrimination, in violation of Title VII of the Civil

Rights Act of 1964, as amended, and N.C. Gen. Stat. § 143-422.2, and

breach of contract and fraudulent misrepresentation under North Carolina law. Defendant filed a motion for change of venue pursuant to 28 U.S.C. § 1404(a), and by Order entered April 17, 2006, the matter was transferred to this District. This Court has original jurisdiction of the Plaintiff's Title VII claim pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction of the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

After carefully considering the Defendant's Motion for Summary Judgment and Memorandum filed in support thereof [Docs. 32, 33], the Plaintiff's Response [Doc. 37], the Defendant's Reply [Doc. 43], as well as the entire record in this case, the Court concludes that summary judgment in favor of the Defendant is appropriate as to the Plaintiff's claims of pregnancy discrimination and breach of contract, and these claims are therefore dismissed. Defendant's request for summary judgment is denied with regard to the Plaintiff's claim of fraudulent misrepresentation.

## II.    The Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of

establishing that there is no genuine issue of material fact rests with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inferences in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor.  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S. Ct. at 2512.

## III. Motion to Strike

Before reaching the merits of the Defendant's summary judgment motion, the Court must first determine the proper scope of the evidentiary record. The Defendant moves to strike portions of Plaintiff's affidavit, arguing (1) that the affidavit is not presented in admissible form, as it was not sworn to before a notary public; (2) that it contains statements of inadmissible hearsay which are not based on Plaintiff's personal knowledge; (3) that it contains inadmissible irrelevant facts; and (4) that it contains statements which conflict with Plaintiff's previously sworn testimony. The Plaintiff has not filed any opposition to the Defendant's motion.

The Defendant first argues, albeit in a footnote, that the evidence presented by the Plaintiff's affidavit is not in admissible form because the affidavit was not sworn to before a notary public. Defendant argues that the affidavit of Paul Lavallee is similarly inadmissible; however, Defendant has not moved to strike Lavallee's affidavit.

Both affidavits challenged by the Defendant are signed and dated by the respective witnesses and recite that they were made under the penalty of perjury. As such, the Court concludes that both affidavits substantially comply with Rule 56(e)'s requirement of form. See In re French, 499 F.3d 345, 358 (4th Cir. 2007) (noting that statement neither sworn under oath nor made under the penalty of perjury "fails to meet the most basic requirement of form required by Rule 56(e)"); 28 U.S.C. § 1746 (setting forth the requirements for unsworn declarations under penalty of perjury). Accordingly, the Court may consider the evidence presented by way of the affidavits of Lavallee and the Plaintiff.

Next, Defendant argues that Plaintiff's affidavit contains statements of inadmissible hearsay which are not based on Plaintiff's personal knowledge. Specifically, Defendant argues that the Plaintiff has cited misleading facts and inadmissible hearsay and has failed to submit

evidence to support a finding of personal knowledge to support the assertions in paragraphs 4, 11, 13, and 14 of her affidavit.

"Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). The affidavit must be made on personal knowledge and contain admissible evidence. See Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show that the affiant is competent to testify to the matters stated therein."). Thus, the affidavit may not be based on inadmissible hearsay. See Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir.), cert. denied, 502 U.S. 939, 112 S. Ct. 373, 116 L. Ed. 2d 325 (1991). Conclusory statements set forth in affidavits must also be disregarded. See Rohrbough v. Wyeth Labs, Inc., 916 F.2d 970, 975 (4th Cir. 1990) (affirming trial court's disregard of doctor's affidavit which was "nearly entirely conclusory and devoid of specific facts to support his opinion").

In paragraph 4 of her affidavit, Plaintiff describes the sales events in which she participated during October 2004 and concludes the paragraph by stating "I was starting my 4th month of pregnancy at this point." [Affidavit of Susan Sweeney ("Plaintiff Aff.") at ¶ 4]. Plaintiff's statement is apparently significant in light of the Plaintiff's argument that her pregnancy was apparent and thus known to her employer prior to her termination, a fact which is disputed between the parties. Defendant argues that, as stated, Plaintiff "misleads the Court to believe that she was, in fact, in her fourth month of pregnancy during October 2004."

While the Court is reluctant to go so far as to say that the statement is an attempt by the Plaintiff to purposefully *mislead* the Court, the Court does note that this statement appears to be in conflict with the first sentence in paragraph 4, in which the Plaintiff states that she became pregnant in August 2004, a fact which the Plaintiff cites to and relies upon in her response brief. If the Plaintiff became pregnant in August 2004, she was in, at most, her third month of pregnancy in October 2004. Accordingly, the Plaintiff's statement that she was four months pregnant in October 2004 is not accurate and therefore will not be considered by the Court in its analysis of the present summary judgment motion.

Defendant further objects to statements in paragraph 11, 13, and 14 of the affidavit, in which Plaintiff recites statements requiring the examination of two levels of hearsay: one pertaining to a statement by the source of the statement to a third party and one pertaining to the repetition of that statement by the third party to the Plaintiff.  The Court will analyze each of these statements in turn.

In paragraph 11 of her affidavit, Plaintiff states: "Later on, after the layoffs, Mr. Lavallee told me that Mr. Cooper was pretty pissed off that I was pregnant and most likely did not return my call for that reason."  This statement is hearsay within hearsay and would be admissible only if each part of the statement qualifies as an exception to the hearsay rule.  See Fed. R. Evid. 805.  A statement is not hearsay if it was made by a party's agent or servant concerning a matter within the scope of the agency or employment and during the existence of the agency or employment relationship.  Cooper's statements to Lavallee may be admissible as an admission of a party-opponent, as his statement apparently was made while he was an agent or employee of the Defendant concerning a matter within the scope of his employment/agency.  See Fed. R. Evid. 801(d)(2)(D).  However, Lavallee's statement relaying Cooper's remarks to

the Plaintiff would not qualify as an admission under this exception, as Lavallee was no longer an employee at the time he made the statement to the Plaintiff. Accordingly, Lavallee's statement to the Plaintiff is inadmissible hearsay, and this statement will be deemed stricken from Plaintiff's affidavit and will not be considered for the purposes of this summary judgment motion.

In paragraph 13 of her affidavit, Plaintiff describes how, after the layoff, she contacted Kerri Johnson about a testing manager position at MARC Global. Plaintiff states that Johnson said that she thought Plaintiff would be a good fit for the position, but that when Johnson asked her boss, Ron Riggin, about considering Plaintiff for the position, that "Riggin told her that he didn't think it would be a good idea, because it would be too complicated given the current situation." [Plaintiff Aff. at ¶ 13]. Both of these statements appear to qualify as admissions of a party opponent, see Fed. R. Evid. 801(d)(2)(D), and therefore, these statements will not be stricken from the Plaintiff's affidavit.[1]

---

[1] While the Court will not strike this evidence on the grounds that it is hearsay, this does not necessarily mean that the Court finds such evidence relevant to the issues presented by this summary judgment motion.

In paragraph 14 of her affidavit, Plaintiff relates a conversation that she had with a headhunter, Brett Stevens, regarding RedPrairie, a company that the Plaintiff alleges was interested in hiring her prior to her termination by the Defendant. Plaintiff relates that Stevens told her that RedPrairie was no longer interested in hiring her. [Plaintiff Aff. at ¶ 14]. This statement is admissible to the extent that it constitutes evidence of notice to the Plaintiff that she was not going to be hired by RedPrairie, and thus, the Court will not strike this statement from the Plaintiff's affidavit.

Defendant next objects to portions of paragraph 3 of the Plaintiff's affidavit, in which Plaintiff testifies to certain actions by Oliver Cooper, Defendant's president and CEO at the time of Plaintiff's employment. Specifically, Plaintiff alleges that when she and Cooper previously worked at a different company together, Cooper had violated his own nonsolicitation agreement and had wrongfully withheld compensation from Plaintiff. [Plaintiff Aff. at ¶ 3]. While the Defendant argues that this evidence is not relevant to the present litigation, as it does not involve the Plaintiff's employment with the Defendant and does not relate to the Plaintiff's claims in this matter, such evidence may have some limited relevance as evidence of prior bad acts. See Fed. R. Evid. 404(b). Thus,

to the extent that this evidence may be admissible to prove Cooper's motive or intent under Rule 404(b), such evidence will not be stricken.

Finally, Defendant argues that the Court should strike certain statements in paragraphs 8, 10, and 12 in Plaintiff's affidavit because these statements conflict with Plaintiff's prior sworn deposition testimony. It is well settled that a party cannot create a genuine issue of material fact in an effort to avoid summary judgment by submitting an affidavit that conflicts with the party's own prior deposition testimony. See Rohrbough, 916 F.2d at 975 ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") (quoting Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984)). Thus, to the extent that these statements contradict Plaintiff's prior deposition testimony, such statements will not be considered by the Court in the course of reciting the relevant facts for the purposes of this summary judgment motion.

For the foregoing reasons, Defendant's Motion to Strike Portions of Plaintiff's Affidavit and Incorporated Memorandum of Law [Doc. 42] is granted in part and denied in part.

## IV. Facts

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite the relevant facts in the light most favorable to the Plaintiff, drawing all reasonable inferences in her favor.

Defendant MARC Global developed and sold computer warehouse management software systems designed to manage complex distribution operations.[2] [Deposition of Susan Sweeney ("Plaintiff Dep.") Vol. 1 at 61-62; Deposition of Oliver Cooper ("Cooper Dep.") at 32].

On October 23, 2003, Plaintiff began her employment with Defendant as a pre-sales business consultant. [Plaintiff Dep. Vol. 1 at 17, 61]. Plaintiff was one of two pre-sales consultants employed by the Defendant. Plaintiff's direct supervisor was Paul Lavallee, Defendant's Executive Vice President for Sales & Marketing. [Plaintiff Dep. Vol. 1 at 61; Affidavit of Oliver Cooper ("Cooper Aff.") at ¶ 4]. As a pre-sales consultant, Plaintiff would accompany other Sales & Marketing personnel to potential client sites and provide product demonstrations based upon the potential client's particular specifications and requirements. [Plaintiff Dep. Vol. 1 at 79; Cooper Dep. at 34; Cooper Aff. at ¶ 4]. When Plaintiff was first hired, she

---

[2]MARC Global was acquired by RedPrairie Corporation ("RedPrairie") in February, 2006. [Cooper Aff. at ¶ 1; Cooper Dep. at 58].

worked out of her home in Winston-Salem, North Carolina. She

subsequently moved to Charlotte, North Carolina, and worked from her

home office there. [Plaintiff Dep. Vol. 1 at 51, 75].

Plaintiff became pregnant in August, 2004. She continued to work

full time and travel with the sales team three to four times per month.

[Plaintiff Aff. at ¶ 4]. Defendant's president and chief executive officer,

Oliver Cooper, rarely saw the Plaintiff, except at meetings or trade shows.

Cooper saw the Plaintiff on a few occasions in August and October, 2004.

[Cooper Aff. at ¶ 6; Plaintiff Aff. at ¶ 4]. Cooper did not notice any visible

signs of Plaintiff's pregnancy when he saw her on those occasions.

[Cooper Aff. at ¶ 16].

### A.    Plaintiff's 2005 Compensation Agreement

In 2004, Plaintiff's compensation package consisted of a total

targeted compensation of $155,000, comprised of $90,000 in base salary

and the remainder consisting of potential commissions resulting from sales

that she participated in generating. [Plaintiff Dep. Vol. 1 at 64, Ex. 2;

Plaintiff Dep. Vol. 2 at 9-10]. On November 9, 2004, during her annual

review with Paul Lavallee, Plaintiff asked that her compensation plan for

2005 be re-evaluated based upon her value to the team.  [Plaintiff Dep. Vol. 1 at 143; Plaintiff Aff. at ¶ 5].

While she was negotiating a new compensation plan for 2005, Plaintiff was approached by a headhunter, Brett Stevens, who advised her that RedPrairie, a direct competitor of the Defendant was "very interested" in hiring her.  [Plaintiff Aff. at ¶ 6].  Stevens told her of the "exact terms" that RedPrairie could offer, and the Plaintiff "was very pleased." [Plaintiff Aff. at ¶ 7].  While Plaintiff and Stevens had extensive discussions regarding her potential employment at RedPrairie, it is undisputed that RedPrairie never made a formal job offer to her.  [Plaintiff Dep. Vol. 1 at 153, 156].

Lavallee heard a rumor that Plaintiff was being pursued by RedPrairie and confirmed this fact with the Plaintiff.[3]  He then shared this information with Cooper.  [Lavallee Aff. at ¶ 7].  In response to this information, Cooper initially told Lavallee to terminate the Plaintiff.  [Id.].  A few days later, however, Cooper indicated to Lavallee that he was

_____

[3]Defendant asserts that the Plaintiff represented to Lavallee that she had an actual offer of employment from RedPrairie; Plaintiff denies that she made any such representation and insists that she merely confirmed the rumor that she was being pursued by this company.  For the purposes of this motion, the Plaintiff's version of these events will be accepted as true.

concerned that Plaintiff had not previously signed a non-competition clause. He advised Lavallee that he would renegotiate the Plaintiff's 2005 compensation package, and that it was his goal to get Plaintiff to sign a non-competition agreement, wherein she would agree not to seek employment with Red Prairie for up to one year after her separation of employment with the Defendant. [Lavallee Aff. at ¶ 8]. Cooper later stated in an email to Lavallee on December 17, 2004, in reference to Plaintiff's salary demands, "I guess we have to pay the ransom." [Cooper Dep., Ex. 7].

Cooper contacted the Plaintiff and informed her that he was personally working out a new compensation plan for her and that she should not consider leaving the Defendant. He told her that her base salary would be increased and that her bonuses would be calculated based on company revenues as a whole, instead of new sales revenues. Cooper advised the Plaintiff of the projected 2005 revenues, and told her that those numbers were "very achievable," and that there should not be any problem with her achieving her full bonuses in 2005. Cooper stated that in return for this compensation package, Plaintiff would have to sign a non-competition agreement prohibiting her employment with RedPrairie.

[Plaintiff Aff. at ¶ 9].  Based upon Cooper's representations, Plaintiff discontinued her pursuit of the RedPrairie job. [Id. at ¶ 7].

After the Plaintiff received the proposed compensation plan for 2005, she contacted Defendant's human resources manager, Carol Lewis, to discuss the maternity leave offered as part of the company's short-term disability policy and whether her quarterly bonuses under the 2005 compensation plan may be affected by her taking short-term disability.[4] [Plaintiff Aff. at ¶ 10].  Plaintiff did not advise Lewis that she was pregnant during this conversation. [Lewis Dep. at 52-54, 79; Plaintiff's Dep. Vol. 1 at 91; Plaintiff's Dep. Vol. 2 at 68].

Plaintiff signed the 2005 compensation plan on December 21, 2004. [Plaintiff Dep. Vol. 1, Ex. 12; Cooper Aff. at ¶ 8; Plaintiff Aff. at ¶ 10]. Plaintiff's base salary was increased to $100,000 and the bonus potential was tied to company targeted revenue numbers. [Plaintiff Dep. Vol. 1 at 168].  The 2005 compensation agreement also included a termination clause, awarding her a severance, payment for accrued but unused paid time off, and a prorated portion of the bonus in the event of her termination

---

[4]Lewis denies specifically discussing maternity leave with the Plaintiff during this conversation. [Lewis Dep. at 54].  However, for the purposes of this motion, the Court will accept the Plaintiff's version of this conversation as true.

without cause. [Plaintiff Dep. Vol. 1 at 173-74, 185-86, Ex. 12; Plaintiff Dep. Vol. 2 at 60-61, Ex. 18]. Plaintiff agrees that she received all payments that she was entitled to receive under the termination clause of the 2005 compensation agreement. [Plaintiff Dep. Vol. 1 at 189].

**B.    Reduction in Force**

At the Defendant's Board of Directors meeting on December 17, 2004, Cooper presented a work-in-progress business plan and a proposed budget for the upcoming year.  At the time, the Defendant had negative cash flow. [Deposition of Ron Riggin ("Riggin Dep.") at 15].  However, Defendant had recently received an influx of additional working capital from investors, and Cooper was optimistic about potential sales growth in 2005, as Lavallee had indicated a number of potential sales were in the pipeline. [Cooper Aff. at ¶ 8].  Consequently, Cooper's 2005 business plan was premised upon increasing sales revenue by the increase of the size of the sales force. [Cooper Dep. at 80, 91, 139; Cooper Aff. at ¶ 9; Riggin Dep. at 13-15].

The Board of Directors was not completely satisfied that the proposal adequately addressed disappointing sales revenues generated from the

existing Sales & Marketing organization and requested a follow-up session. [Cooper Aff. at ¶ 10; Riggin Dep. at 18].

Subsequently, Cooper met with Chief Technology Officer Ron Riggin and two of the Board members, Bernie Brennan and Jos Haag, on January 5 and 6, 2005 to discuss the proposed 2005 plan and budget. [Cooper Dep. at 43-44, 46, 80-81; Cooper Aff. at ¶ 10]. A key topic of conversation was the need to drastically reduce payroll costs in the Sales & Marketing organization. [Cooper Aff. at ¶ 10].

Over the course of January 5 and 6, Cooper, Riggin, and the Board members reanalyzed the Sales & Marketing organization and developed a more realistic sales pipeline. [Cooper Aff. at ¶ 11]. The group also developed a plan to eliminate a series of positions within the Sales & Marketing organization. This was an interim plan to leverage the company's services over a six-month period with a long-range plan of hiring a new vice president of Sales & Marketing and further restructuring the Sales & Marketing organization. [Id.].

On January 6, 2005, Cooper confirmed his decision to eliminate certain positions in the Sales & Marketing organization by an email to both Brennan and Haag. [Cooper Aff. at ¶12, Ex. D]. Cooper selected the

following persons for elimination as part of this restructuring plan: Paul Lavallee, Executive Vice-President for Sales & Marketing; Paul Kiefer, sales representative; Sondra Elek, marketing; Steve Fowler, pre-sales consultant[5]; and Plaintiff. [Cooper Aff. at ¶ 13, Exs. C, D]. On the day that he decided to terminate the Plaintiff, Cooper told Lavallee, "Susan thinks she has won, [she] thought she was such a good negotiator, but she got screwed in the end." [Lavalle Aff. at ¶ 10].

On January 6, 2005, Plaintiff left Lavallee a voice mail, informing him of her pregnancy. Lavallee returned her call on January 7, 2005 and offered his congratulations. [Plaintiff Aff. at ¶ 11]. On January 7, 2005, Plaintiff left messages for Cooper and Lewis, advising them that she was pregnant. [Plaintiff Dep. at 89-90; Cooper Aff. at ¶ 16]. Plaintiff chose to contact Cooper and others on January 7 because she was scheduled to attend a sales trade show with other employees later that week, at which point her pregnancy would be undeniably visually apparent. [Plaintiff Dep. Vol. 1 at 94-95].

On January 17, 2005, Defendant implemented its decision to restructure and eliminate positions within the Sales & Marketing

---

[5]Fowler resigned prior to the announcement of the restructuring. [Cooper Aff. at ¶ 14].

Department. [Cooper Aff. at ¶ 12]. Plaintiff received a phone call from Cooper and Lewis, informing her that her position had been eliminated effective immediately. That same week, Stevens advised the Plaintiff that RedPrairie was no longer interested in hiring her. [Plaintiff Aff. at ¶ 14].

By her own admission, Plaintiff did not make it known to Cooper that she was pregnant until January 7, 2005 – the day after Cooper memorialized his decision to restructure the Sales & Marketing organization. [Plaintiff Dep. at 89-90]. Cooper denies that he was aware that Plaintiff was pregnant at the time that he made the decision to eliminate Plaintiff's position. [Cooper Aff. at ¶ 16; Cooper Dep. at 142].

## V. Analysis

### A. Breach of Contract Claim

In Count One of the Complaint, Plaintiff alleges that the Defendant is liable for breach of contract. [Doc. 15, Complaint at 7]. During discovery, Plaintiff identified the 2005 compensation agreement as the employment contract which she alleges was breached. [Plaintiff Dep. Vol. 1 at 185, Ex. 12]. Specifically, Plaintiff contends that the 2005 compensation agreement required the Defendant to compensate the Plaintiff at the rate of $155,000, even if the Defendant terminated her prior to the end of 2005.

Because North Carolina is an at-will state, the employment relationship is terminable at any time by either party, absent a contractual agreement establishing a definite term of employment.  See Kurtzman v. Applied Analytical Industries, Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997).  The 2005 compensation agreement in the present case does not establish a definite term of employment for the Plaintiff or otherwise guarantee payment of the rest of her annual salary upon termination. Indeed, by its very terms, the contract contemplates that the employment relationship may be terminated prior to the end of 2005 and that, in the event that this occurred, she would receive certain severance benefits. Specifically, the agreement provides as follows:

> Should MARC terminate your employment without cause, you will receive a minimum of 6-weeks severance pay, payout of any accrued but unused Paid Time Off, and a prorated portion of your annual and quarterly bonus earned through the date of your termination.

[Plaintiff Dep. Vol. 1 at 186, Ex. 12].  It is undisputed that Plaintiff received all of the monies owed to her under this provision. [Plaintiff Dep. Vol. 1 at 189].

The 2005 compensation agreement clearly contemplated that Plaintiff may be terminated without cause prior to the end of the year.  As

such, Plaintiff's interpretation of this contract as creating a definite term of employment entitling her to the total amount of her projected annual salary is without merit.  Accordingly, Plaintiff's breach of contract claim is dismissed.

## B.  Pregnancy Discrimination Claims

In Count Two of the Complaint, Plaintiff alleges that by terminating her employment, the Defendant subjected her to pregnancy discrimination in violation of Title VII and N.C. Gen. Stat. § 143-422.2.  [Doc. 15, Complaint at 7].[6]

### 1.  Title VII Claim

Title VII provides that an employer shall not "discriminate against any individual . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), expanded the scope of discrimination based on "sex" to include discrimination on the basis of pregnancy.  Accordingly, a pregnancy

--------------------------------

[6]While the Plaintiff couches her claim in terms of "pregnancy and sex discrimination, retaliation, wrongful termination, and disparate treatment," [Doc. 15, Complaint at 7], Plaintiff has not presented any evidence of gender discrimination or otherwise attempted to state a prima facie case of discrimination based solely on her gender.  Nor has the Plaintiff attempted to prove a case of retaliation, as she has not presented any evidence that she engaged in any type of protected activity prior to her termination.  Accordingly, the Court will limit its analysis to the Plaintiff's claim of pregnancy discrimination resulting in her wrongful termination.

discrimination claim is analyzed in the same manner as any other sex

discrimination claim under Title VII.  DeJarnette v. Corning Inc., 133 F.3d

293, 297 (4th Cir. 1998).

In a Title VII case, the plaintiff has "the ultimate burden of persuading

the court that she has been victim of intentional discrimination."  Texas

Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089,

1095, 67 L. Ed. 2d 207 (1981).  Thus, a plaintiff in a pregnancy

discrimination case has "the ultimate burden of establishing that the

defendant discriminated against her 'because of' her pregnancy."

DeJarnette, 133 F.3d at 297.

In the present case, the Plaintiff does not offer any direct evidence of

pregnancy discrimination.  Therefore, the Court must analyze Plaintiff's

claim under the burden-shifting analysis established by the Supreme Court

in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.

Ed. 2d 668 (1973).  Under the  McDonnell Douglas framework, a Title VII

plaintiff must show: "(1) she is a member of a protected class; (2) she

suffered [an] adverse employment action; (3) she was performing her job

duties at a level that met her employer's legitimate expectations at the time

of the adverse employment action; and (4) the position remained open or

was filled by similarly qualified applicants outside the protected class."

Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (quoting Hill v.

Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (en

banc)).  When the adverse employment action results from a reduction in

force, the plaintiff may satisfy the fourth element of the prima facie case by

showing that the employer did not treat pregnancy neutrally when making

its decision.  See Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998)

(allowing plaintiff who was terminated through reduction in force to satisfy

fourth element of prima facie case by showing that employer did not treat

age or race neutrally in making decision).

Once the plaintiff establishes a prima facie case, the burden then

shifts to the defendant to "produce a legitimate, non-discriminatory reason

for the termination."  Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513-14

(4th Cir.), cert. denied, 127 S. Ct. 53, 166 L. Ed. 2d 21 (2006).  "The

employer's burden at this stage 'is one of production, not persuasion; it can

involve no credibility assessment.'" Id. at 514 (quoting Reeves v.

Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097,

2106, 147 L. Ed. 2d 105 (2000)).  If the defendant meets its burden of

production, then the presumption created by the prima facie case is

rebutted and "drops from the case." <u>Burdine</u>, 450 U.S. at 255 n.10, 101 S. Ct. 1095 n.10.

Once the employer satisfies its burden, the burden then shifts to the plaintiff to show that the defendant's proffered reason is pretextual. <u>Reeves</u>, 530 U.S. at 143, 120 S. Ct. at 2106. The plaintiff may prove pretext "either by showing that [the employer's] explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of age discrimination." <u>Mereish v. Walker</u>, 359 F.3d 330, 3346 (4th Cir. 2004). At this stage, the plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." <u>Burdine</u>, 450 U.S. at 256, 101 S. Ct. at 1095. Although the burden of production shifts between the parties, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at 253, 101 S. Ct. at 1093.

In reviewing the defendant's articulated reasons for the plaintiff's discharge, the Court is ever mindful that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." <u>DeJarnette</u>, 133 F.3d at 298-99 (quoting <u>Jimenez v. Mary Washington College</u>, 57 F.3d

369, 377 (4th Cir. 1995)).  As such, the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." DeJarnette, 133 F.3d at 299 (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997)).  Rather, the Court's concern is whether the plaintiff has provided "enough evidence upon which a reasonable jury could find that the termination was actually motivated by the pregnancy."  Zeuner v. Rare Hospitality Int'l, Inc., 338 F. Supp. 2d 626, 640 (M.D.N.C. 2004).

The Defendant argues that the Plaintiff cannot establish a prima facie case of discrimination because the undisputed facts show that (1) the Defendant did not have any knowledge that the Plaintiff was pregnant at the time that the decision to terminate her was made and (2) the Plaintiff's pregnancy had no bearing on the decision to include her in the reduction in force.

Although the Fourth Circuit has not addressed the issue, several other circuits have held that a plaintiff in a pregnancy discrimination case must present evidence that the employer had *actual* knowledge of her pregnancy at the time that the adverse employment decision was made in

order to satisfy the first element of the prima facie case.  See Prebilich-Holland v. Gaylord Entertainment Co., 297 F.3d 438, 443-44 (6th Cir. 2002); Clay v. Holy Cross Hosp., 253 F.3d 1000, 1007 n.7 (7th Cir. 2001); Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996).

As the Third Circuit stated in Geraci:

> Pregnancy, of course, is different in that its obviousness varies, both temporally and as between different affected individuals.  It is difficult to imagine that an employer would not be aware that an employee is in the later stages of her pregnancy, at least if the employer sees the employee.  When the pregnancy is apparent, or where plaintiff alleges that she has disclosed it to the employer, then a question of the employer's knowledge would likely preclude summary judgment.  If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which a rational jury could infer that the employer knew that she was pregnant.

Geraci, 82 F.3d at 581.

In the present case, the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that the Defendant had any knowledge of her pregnancy at the time that the adverse employment decision was made on January 6, 2005.  While Plaintiff was several months pregnant at that point, the undisputed facts show that the

Plaintiff worked at home and only saw her co-workers at sales meetings and other functions three to four times per month. Plaintiff has presented no forecast of evidence that her pregnancy was apparent to anyone at the company prior to her public announcement in January, 2005. It is undisputed that the decisionmaker in this case, Oliver Cooper, last saw the Plaintiff in October, 2005 and did not notice any visible signs of pregnancy at that time.

Further, Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that she disclosed her pregnancy to anyone at the company prior to January 6, 2005. While the Plaintiff alleges that Carol Lewis testified that both she and Paul Lavallee were aware of Plaintiff's pregnancy while the 2005 compensation plan was being negotiated, the portions of Lewis' testimony cited by the Plaintiff do not support this assertion. The Plaintiff also argues that the Defendant was given reason to believe that she was pregnant due to her conversation with Carol Lewis in December, 2005, in which Plaintiff inquired about maternity leave available through the company's short-term disability plan.[7]

---

[7]While Lewis denies that she and the Plaintiff discussed maternity leave, Plaintiff's version of the conversation must be taken as true at this stage in the proceedings.

However, it is undisputed that the issue of maternity leave was raised in the context of the short-term disability benefits that would be available to the Plaintiff in the future.  Plaintiff, by her own admission, never told Lewis that she was, in fact, pregnant, and thus, Plaintiff's mere inquiries about short-term disability and maternity leave would not have given the Defendant actual notice of her pregnancy.  At best, this evidence shows that Lewis may have been suspicious that Plaintiff was pregnant or planning to become pregnant.  Such "suspicions," however, are insufficient to meet Plaintiff's burden of showing that the employer in fact knew of her pregnancy.   See Prebilich-Holland, 297 F.3d at 444; Clay, 253 F.3d at 1007 n.7; Geraci, 82 F.3d at 581.

The undisputed evidence shows that Plaintiff did not tell Cooper that she was pregnant until January 7, 2005, the day after Cooper decided that the Plaintiff's employment would be terminated.  Because there is no evidence that Cooper was aware of the Plaintiff's pregnancy until after the decision to terminate her had already been made, the Plaintiff cannot prove that her pregnancy was a factor in the decision to include her in the reduction in force.  As such, Plaintiff cannot make a prima facie case of

pregnancy discrimination, and thus, her claim under Title VII must be dismissed. **2.     State Law Discrimination Claim**

Plaintiff alleges that the Defendant wrongfully discharged her in violation of North Carolina public policy as embodied in the North Carolina Equal Employment Practice Act, N.C. Gen. Stat. § 143-422.2, which is a statement of North Carolina's public policy against "discrimination . . . on account of race, religion, color, national origin, age, *sex* or handicap . . . ." N.C. Gen. Stat. § 143-422.2 (emphasis added).  To date, no North Carolina courts has addressed whether this statutory provision encompasses a claim of pregnancy discrimination.  Assuming that the North Carolina courts would recognize such a claim, it would likely be analyzed in the same manner as the Plaintiff's Title VII claim, as the North Carolina Supreme Court has adopted Title VII evidentiary standards and principles of law in evaluating discrimination claims under § 143-422.2. See North Carolina Dep't of Correction v. Gibson, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983).  Because the Court has determined that the Plaintiff has failed to establish facts to support her claim under Title VII that the Defendant terminated her due to her pregnancy, Plaintiff's pregnancy discrimination claim under § 143-422.2 – to the extent that such a claim

even exists – must also be dismissed. <u>See</u> <u>Knezevic v. Hipage Co.</u>, 981 F.

Supp. 393, 397 (E.D.N.C.) (holding pregnancy discrimination claim under §

143-422.2 "must suffer the same fate" as plaintiff's Title VII claim), <u>aff'd</u>,

129 F.3d 1259 (4th Cir. 1997).

### C.    Fraudulent Misrepresentation Claim

Finally, Plaintiff alleges that the Defendant is liable for "employment

fraud based upon the fraudulent misrepresentations made by Cooper."

[Doc. 15, Complaint at 7].  Specifically, the Plaintiff alleges that during the

negotiations of the 2005 compensation plan, Cooper either lied or failed to

disclose information regarding the Defendant's financial stability and/or

plans for 2005, and that Cooper in fact had no intention of retaining her.

Plaintiff further alleges that as a result of these misrepresentations, Plaintiff

did not pursue a job offer from RedPrairie and thereafter entered in a

noncompetition agreement expressly prohibiting her employment with

RedPrairie for one year.

To prevail on a claim of fraudulent misrepresentation, a plaintiff must

establish the following elements:

> (a) that the defendant made a representation
> relating to some material past or existing fact; (b)
> that the representation was false; (c) that when he
> made it defendant knew it was false or made it

> recklessly without any knowledge or its truth and as
> a positive assertion; (d) that the defendant made
> the false representation with the intention that it
> should be acted on by the plaintiff; (e) that the
> plaintiff reasonably relied upon the representation
> and acted upon it; and (f) that the plaintiff suffered injury.

Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568, 374

S.E.2d 385, 391 (1988).

In the present case, the Plaintiff has presented evidence that Cooper

made several statements and promises to her during the negotiation of her

2005 compensation plan. She testified that Cooper told her that he wanted

her to stay with the company. He promised that her base salary would be

increased and that her bonuses would be calculated based on company

revenues as a whole, instead of new sales revenues. Cooper further

advised the Plaintiff of the projected 2005 revenues, told her that those

numbers were "very achievable," and that there should not be any problem

with her achieving her full bonuses in 2005.

"As a general rule, a mere promissory representation will not support

an action for fraud." Braun v. Glade Valley School, Inc., 77 N.C. App. 83,

87, 334 S.E.2d 404, 407 (1985). However, a promissory representation

may support a fraud action where "the misrepresentation is made with

intent to deceive and with no intent to comply with the stated promise or

representation." Id. Based upon the Plaintiff's forecast of evidence, a reasonable jury could conclude that Cooper had no intention of retaining the Plaintiff as an employee and that he misrepresented his intention for the purpose of inducing her to sign a noncompetition agreement to prevent her from working with the Defendant's main competitor upon her termination. Cooper had previously instructed Lavallee to fire the Plaintiff but changed his mind after realizing that she had not signed a noncompetition agreement. Thereafter, Cooper told the Plaintiff that he would renegotiate her compensation plan and represented to the Plaintiff that he wanted her to remain with the company. Although Cooper privately referred to Plaintiff's salary demands as a "ransom," he agreed to pay her a higher salary, so long as the Plaintiff signed the non-competition agreement prohibiting her from seeking employment with RedPrairie. Cooper further made representations to the Plaintiff regarding the positive financial outlook of the company and her ability to achieve her full bonuses in the coming year, despite the fact that the company was operating with a negative cash flow and was experiencing other financial difficulties. Finally, on the day that he decided to terminate the Plaintiff, Cooper told Lavallee, "Susan thinks she has won, [she] thought she was such a good

negotiator, but she got screwed in the end." Viewing this evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that Cooper made promissory misrepresentations to the Plaintiff with an intent to deceive her.

The Defendant argues that the Plaintiff's misrepresentation claim must fail because she has no actual damages as a result of any alleged misrepresentations, as she never received a firm written offer from RedPrairie.  Under North Carolina law, certain torts, including claims for negligent misrepresentation, fraud, and constructive fraud, require proof that the plaintiff incurred actual damages.  <u>Piedmont Institute of Pain Mgmt. v. Staton Found.</u>, 157 N.C. App. 577, 589-90, 581 S.E.2d 68, 76, <u>review denied</u>, 357 N.C. 507, 587 S.E.2d 672 (2003).  In the present case, the Plaintiff has presented a forecast of evidence from which a jury could reasonably conclude that she suffered actual damage as a result of Defendant's alleged misconduct.  The evidence viewed in the light most favorable to the Plaintiff demonstrates that the Plaintiff had been contacted by a headhunter, who indicated that Defendant's main competitor, RedPrairie, was interested in hiring her.  The headhunter advised her of the "exact terms" that RedPrairie could offer, and the Plaintiff "was very

pleased" about these terms.  While Plaintiff terminated her discussions with RedPrairie prior to receiving a formal written offer of employment, a reasonable jury nevertheless could conclude on these facts that the Plaintiff was deprived of a employment opportunity with RedPrairie as a result of the Defendant's conduct, and thus suffered actual damages.

Finally, Defendant argues that the Plaintiff cannot recover on this claim because she misrepresented to the Defendant that she had a job offer from RedPrairie when in fact she did not, and therefore she comes to the Court with unclean hands.  The Plaintiff denies make any such representation to the Defendant, and the Court is obligated to take Plaintiff's denial as true at this stage in the proceedings.  In any event, the doctrine of unclean hands is an equitable defense which is available only when the plaintiff is seeking an equitable remedy.  Food Lion, Inc. v. Capital Cities/ABC, Inc., 951 F. Supp. 1233, 1234 (M.D.N.C. 1996).  As the Plaintiff brings this action for damages and does not seek any equitable relief relative to her misrepresentation claim, this defense is not available to the Defendant.

**O R D E R**

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 32] is **GRANTED** with respect to the Plaintiff's claim for breach of contract and her claims for pregnancy discrimination under Title VII and N.C. Gen. Stat. § 143-422.2. The Motion for Summary Judgment is **DENIED** with respect to the Plaintiff's claim for fraudulent misrepresentation.

**IT IS FURTHER ORDERED** that the Defendant's Motion to Strike Portions of Plaintiff's Affidavit [Doc. 42] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

Signed: February 4, 2008

Martin Reidinger
United States District Judge